**Cecil T. GOWER, Plaintiff,**

v.

**UNITED STATES FIDELITY & GUARANTY COMPANY, Defendant.**

No. 93–211–CIV–5–F.

United States District Court, E.D. North Carolina, Raleigh Division.

Feb. 10, 1994.

Lynn Fontana, Fontana, Fine & Copeley, Durham, NC, Abigail S. Fine, Fontana, Fine & Copeley, Durham, NC, for plaintiff.

Charles A. Edwards, Womble, Carlyle, Sandridge & Rice, Raleigh, NC, Andrew B. Cohen, Moore & Van Allen, Durham, NC, for defendant.

### ORDER

JAMES C. FOX, Chief Judge.

This matter is before the court on motion by the defendant, United States Fidelity & Guaranty Company (hereinafter "USF & G"), for summary judgment in this action alleging violation of the Age Discrimination in Employment Act (hereinafter "ADEA"), 29 U.S.C. §§ 621 et seq., as well as on plaintiff's derivative claims for wrongful discharge predicated upon age discrimination under the laws of the State of North Carolina. Plaintiff, Cecil T. Gower, has filed a Response in opposition to USF & G's motion, and USF & G has filed a Reply thereto. The matter is ripe for disposition.

### FACTUAL BACKGROUND

In the light most favorable to the plaintiff, Cecil T. "Tommy" Gower, the facts underlying this action appear to be as follows. Gower worked for USF & G for 32 years. He was employed by USF & G in 1960, as a mail and stock clerk and, shortly thereafter became an accounting clerk. He then worked a temporary assignment in internal auditing, covering the northeastern part of the United States. Gower was dissatisfied with his job conditions as a field auditor and admits that he later turned down one job offer which would have required him to transfer. Following that assignment, Gower returned to Raleigh as an insurance auditor, covering eastern North Carolina.

In 1969, after working in auditing for approximately two years, Gower was promoted to the position of accounting superintendent. In 1985, he became the Superintendent of Administrative Services, and in 1991, his job title changed to that of Administrative Services Manager (hereinafter "ASM") in the Raleigh office.

At his deposition, Gower testified that on several occasions during the 1960's and 1970's, he discussed a desire for further advancement with his superiors, the succession of General Managers in the Raleigh branch

office. He concedes that he did not pursue the issue after General Manager Philip Salling offered no real encouragement to his aspirations. USF & G contends that the only position in which Gower expressly voiced any interest was that of Branch Assistant Manager in Raleigh. Gower points to his testimony during his deposition that he allegedly told Mr. Salling he was willing to transfer in order to become an assistant manager.[1]

USF & G's C.E.O. was replaced in late 1990, and a series of "focus groups" or "task forces" was formed to provide a more efficient and economical re-ordering of the corporation in response to its having fallen on hard times. As a result, there began a sequence of restructuring which included down-sizing, centralization and the elimination of redundant functions throughout the company. Included in the restructuring process was the elimination of all ASM positions.

In January 1992, USF & G's vice president of planning and analysis, Christie A. Hunter, led a special project to investigate the possibility of centralizing the agency accounting functions that were in the field. The largest savings were to be realized by eliminating the cashier position at the branch level.

At the same time USF & G was considering eliminating the ASM position, it also was considering adding a job position to assume some duties of the ASM's which were to remain in the branch offices. In March 1992, USF & G considered creating a "branch services supervisor" position which would take over the administrative duties of the ASM. In the end, two job positions were created to replace the ASM's duties remaining in the branch offices: (i) the proposed "branch services supervisor" position became the "support services supervisor" position by the fall of 1992; and (ii) a branch human resources manager position was created. Some of the former ASM's still with USF & G as of January 1993, became support services supervisors (hereinafter "SSS's").

In April 1991, Joe Kirk became the general manager of USF & G's Charlotte, North Carolina branch after he was demoted from the position of regional vice president. He reported to Urb Leimkuhler, vice president in charge of the Southern Region. The phaseout of ASM's commenced contemporaneously with a direction to Kirk to assume operational control over the Raleigh branch, consolidate the accounting operations into Charlotte, cut the combined accounting work force by more than half, consolidate most of the non-accounting functions into Charlotte, and reduce the remaining Raleigh work force.

In 1991, Kirk consolidated the Columbia, South Carolina, office into the Charlotte office. In so doing, Kirk retained Charlotte office ASM, Colleen Rogers; Ms. Rogers at that time was 37 years old. The ASM of the Columbia office which had been consolidated into the Charlotte office, Larry Bailey, age 58, was terminated.

In 1992, USF & G determined that the Raleigh branch office, in which Gower was ASM, also would be consolidated into the Charlotte office. On April 21, 1992, Kirk traveled to Raleigh and met with the managers in that office. Some were offered transfer to Charlotte, but Gower was not. Kirk was responsible for proposing reporting relationships and proposing reduction of personnel for the consolidation. Knowing that the ASM position in Charlotte was slated for elimination on July 1, 1992, Kirk advised Gower that it would be senseless to talk about a transfer for such a short period.

Evidence produced during discovery reveals that Kirk had targeted Colleen Rogers as a "comer" in the company and had alerted Christie Hunter, USF & G's vice president of planning and analysis, that Ms. Rogers was an employee to consider for "any kind of position that ... needed a good, solid accounting employee." Kirk Depo. at 34–35; 81–82. Kirk made these recommendations before he ever met Gower.

---

1. In his May 29, 1992, application for employment with the State of North Carolina, Gower answered "No" to the question, "Will you accept work anywhere in NC?" He explained that he would be willing to work only in "Wake [County] and vicinity." Exhibit 19 to Defendant's Motion for Summary Judgment.

The evidence of record suggests that it was anticipated that Ms. Rogers, who had been retained temporarily as ASM in Charlotte, was a candidate for transfer to the home office in Baltimore. According to Ms. Rogers, she interviewed for a job at the home office in Baltimore "the first or second week of May" and actually began working in Baltimore on June 8.

Kirk has testified at deposition that his supervisor, Leimkuhler, had not talked to him about the age, race or sex of employees to be terminated, and that Leimkuhler even had the USF & G legal department and human resources personnel review the termination plan. Neither department recommended any changes.

Gower was offered a severance package totalling $76,095.27, of which $7,095.00 was accrued vacation pay, effective May 8, 1992. Gower accepted that package. He was 50 years old when he was terminated and his annual salary was $55,900.00. At that time he was the oldest and longest-tenured department head in the Raleigh branch office. He contends he was the only department head who was not offered either a transfer or retained in the Raleigh office.

Gower's November 25, 1991, performance evaluation had rated his performance as "surpasses expectations," the same rating given to Ms. Rogers. However, in June 1992, a month *after* his termination, Joe Kirk completed a retroactive evaluation which rated him as "achieves expectations." Kirk has explained that the post-termination evaluation was requested by the home office to bring all evaluations current to December 31st. Kirk repeatedly has stated that at no time did he compare Rogers' and Gower's performance in determining to terminate Gower and to retain Rogers. However, Gower interprets the June 1992, evaluation as a ruse concocted to legitimate his termination which, in fact, was based on his age.

A month after Gower's termination was effective, Kirk announced that Ms. Rogers would assume her new position in the Home Office Accounting Central Processing Unit, and that 28–year old Chris Hart would be responsible for the Charlotte Accounting and Service Departments pending the restructur-

ing of the branch office Accounting operation in July, 1992—the following month. Hart became the Support Services Supervisor (SSS) in Charlotte, which position includes the accounting function, the file room, mail and supply, and the switchboard. That position initially paid $31,356.00, and was increased a year later to $42,848.00.

Thirty-three year old Betsy Creech was hired in December 1992, on a part-time basis as Human Resources Manager in Raleigh. She performed any human resources duties formerly performed by Gower.

Gower's position in this lawsuit is that, since Ms. Rogers was younger than he, she rather than he should have been terminated, and that he should have been transferred to Charlotte, thus putting him "in line" for the home office position when it became available. He contends that, but for his age, he would have been retained or transferred rather than terminated. He apparently believes that the company's explanation that it had "no place" for him upon restructuring was merely a pretext for age discrimination. He filed a timely charge of age discrimination with the Equal Employment Opportunity Commission ("EEOC") and, upon conclusion of the EEOC's investigation, filed this action against USF & G pursuant to the ADEA and state law prohibitions against wrongful discharge.

### ANALYSIS

The question of a motion for summary judgment is similar to that on a motion for directed verdict or for verdict notwithstanding judgment: whether a reasonable factfinder could return a verdict for the party opposing the motion on the basis of the evidence presented. *Anderson v. Liberty Lobby,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). The inquiry on summary judgment includes assessment of the evidence in light of the evidentiary burden each party will bear at trial. *Id.* Where a plaintiff must prove his case by a preponderance of the evidence, it must be apparent on summary judgment that he will be able to present evidence at trial sufficient to allow a reasonable jury to find that he has proved his

case by a preponderance. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

In cases such as this, where a major element of the age discrimination claim has to do with a defendant's state of mind, summary judgment often is difficult to justify. However, if the defendant meets the requirements of Rule 56, Fed.R.Civ.P., the court must grant judgment for the movant. *Ballinger v. North Carolina Agricultural Extension Service,* 815 F.2d 1001, 1004 (4th Cir.), *cert. denied,* 484 U.S. 897, 108 S.Ct. 232, 98 L.Ed.2d 191 (1987).

The shifting burden of proof/production scheme in discrimination cases is well-established. As it recently was reiterated by the Supreme Court in a Title VII case, *St. Mary's Honor Center v. Hicks,* 509 U.S. ——, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993), a plaintiff first must establish, by a preponderance of the evidence, a prima facie case of discrimination, the elements of which vary depending upon the specific disparate treatment alleged, which " 'in effect creates a presumption that the employer unlawfully discriminated against the employee.' " *Id.* at ——, 113 S.Ct. at 2747 (quoting *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 254, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981)). This presumption then "places upon the defendant the burden of producing an explanation to rebut the prima facie case—i.e., the burden of 'producing evidence' that the adverse employment actions were taken 'for a legitimate, non-discriminatory reason.' " *Id.* (quoting *Burdine,* 450 U.S. at 254, 101 S.Ct. at 1094). If the employer satisfies this burden, which is one of production rather than of proof, "the presumption raised by the prima facie case is rebutted," and "drops from the case." *Id.* at 255 & n. 10, 101 S.Ct. at 1095 & n. 10 (1981); *Holder v. City of Raleigh,* 867 F.2d 823, 827–28 (4th Cir.1989).

The burden then shifts back to the plaintiff for an opportunity to prove "that the proffered reason was not the true reason for the employment decision," but instead was a pretext to conceal an unlawful discriminatory motive. *Hicks,* 509 U.S. at ——, 113 S.Ct. at 2747. Mere proof of pretext is not enough, however, since "the ultimate burden of persuading the [trier of fact] that [he] intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Id.* ——, 113 S.Ct. at 2753 (quoting *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093–94). Specifically, the plaintiff ultimately must prove that "but for" his or her age, the adverse employment decision would not have been made, *see Conkwright v. Westinghouse Electric Corp.,* 933 F.2d 231, 233 (4th Cir.1991), or as alternatively expressed, that "age was a determining factor" in the decision. *Wilhelm v. Blue Bell, Inc.,* 773 F.2d 1429, 1432 (4th Cir.1985), *cert. denied,* 475 U.S. 1016, 106 S.Ct. 1199, 89 L.Ed.2d 313 (1986).

In a reduction-in-force case, such as the one at issue, the first three elements of the plaintiff's prima facie case essentially are the same as in any other disparate treatment case: "(1) the plaintiff is in the protected age group [i.e., age 40 or older]; (2) the plaintiff was discharged or demoted; [and (3) ] at the time of his discharge or demotion, the plaintiff was performing his job at a level that met his employer's legitimate expectations...." *Equal Employment Opportunity Commission v. Western Electric Co.,* 713 F.2d 1011, 1014 (4th Cir.1983). There appears to be no serious dispute but that Gower has produced sufficient evidence of these first three elements of his prima facie case.

The traditional fourth element of the prima facie case—"following his discharge or demotion, the plaintiff was replaced by someone of comparable qualifications outside the protected class"—"will not fit well in most reduction-in-force cases." *Id.* (citations omitted).

> In such cases, the claimant's job is often phased out and thus he would be unable to point to a replacement.... Although a plaintiff in a reduction-in-force case normally is unable to show that he was replaced by [a member of a non-protected class], he can nevertheless establish a "prima facie case" by producing some other evidence that the employer did not treat age neutrally.

*Id.* at 1014–15 (citing *McCorstin v. United States Steel Corp.,* 621 F.2d 749, 753 (5th Cir.), *reh'g denied,* 627 F.2d 239 (1980)); *see also Fink v. Western Electric Co.,* 708 F.2d

909 (4th Cir.1983); *Williams v. General Motors Corp.*, 656 F.2d 120, 129–30 (5th Cir. 1981), *cert. denied*, 455 U.S. 943, 102 S.Ct. 1439, 71 L.Ed.2d 655 (1982); *accord Herold v. Hajoca Corp.*, 864 F.2d 317, 320 (4th Cir. 1988), *cert. denied*, 490 U.S. 1107, 109 S.Ct. 3159, 104 L.Ed.2d 1022 (1989) (fourth element may be satisfied by showing "that persons outside the protected class were retained in the same position *or* that there was some other evidence indicating that the employer did not treat age neutrally" in deciding to "dismiss the plaintiff") (emphasis in original) (citing *Western Electric*, 713 F.2d at 1014–15)).

■■■ It is insufficient, according to the Fourth Circuit Court of Appeals, to allow the plaintiff to rest upon proof of the first three elements of his prima facie case. *Western Electric*, 713 F.2d at 1014.

> Before requiring [the employer] to produce evidence of legitimate business reasons for the [adverse] selections, the district court should have required [the plaintiff] to show that, upon the claimants' demotions, persons outside the protected age class were retained in the same positions, or to produce some other evidence that [the employer] did not treat age neutrally in its demotion selections.

*Id.* at 1015. In the instant case, Gower seeks to show this fourth element by evidence that, less than four weeks following his termination, 28–year–old Chris Hart took over responsibility for the accounting and service departments, and that Hart now is the support services supervisor for the combined Raleigh/Charlotte operation. In addition, Gower points out that 33–year–old Betsy Creech was a new-hire in December, 1992, as the part-time Human Resources Manager in Raleigh, assuming any human resources duties formerly performed by Gower while he was ASM. Thus, Gower contends, he was terminated and subsequently replaced by, not one but, two persons outside the protected age class. This evidence, he contends, is sufficient to prove his prima facie case.

USF & G, on the other hand, emphasizes that the plan from the inception was to eliminate all ASM positions. The position to which Gower insists he should have been transferred, that of ASM in Charlotte, was slated for elimination by July 1, 1992, and was not filled when the incumbent, Colleen Rogers, transferred to the home office in early June, 1992. USF & G refers the court to a recent observation by the Maryland District Court that a "[p]laintiff ... cannot satisfy his prima facie case because the 'job' which he held was discontinued in the reorganization of the department. It [is] therefore impossible for a person outside the protected class to be retained in the position." *Moore v. Reese*, 817 F.Supp. 1290, 1299 (D.Md.1993).

USF & G insists that, in reduction-in-force cases such as this, it is more appropriate to require the plaintiff to address the fourth element by producing "some other evidence that [the employer] did not treat age neutrally in its personnel decisions." *Western Electric*, 713 F.2d at 1015. Rather than focus on employees who remained with the company after reorganization, USF & G urges the court to concentrate instead on those who did not in determining whether its decisions were age-neutral. Such an inquiry requires some statistical examination.

Gower notes that, as of January 1993, there still were eight ASM's at USF & G who were under age 40, including at least three whose performance ratings were below his.[2] All remaining ASM positions were eliminated, however, within the next few months. Furthermore, USF & G emphasizes that Kirk's testimony is to the effect that performance ratings were not a factor in Gower's termination; rather, his job was eliminated. USF & G caustically remarks that Gower's selective revelation of statistical data is the "sort of seat-of-the-pants pseudo-statistical evidence" which "is worthless unless we are told who was *not* fired in preference to those fired." USF & G's Reply Memorandum at 3, n. 5 (citing *Zick v. Verson*

---

**2.** USF & G notes that the exhibit upon which Gower relies in making this assertion contains a number of inaccuracies, of which Gower is aware. USF & G points out that the exhibit correctly reveals that as of January 1992, 23 incumbent ASM's remained, 15 of which were over the age of 40, compared with eight below.

*Allsteel Press Co.,* 644 F.Supp. 906, 912 (N.D.Ill.1986) (emphasis in original), *aff'd mem.,* 819 F.2d 1143 (7th Cir.1987)).

Gower also offers as proof that USF & G did not treat age neutrally, the fact that Kirk, the primary decision maker, previously consolidated the Columbia branch office into the Charlotte branch, retaining the 37–year-old ASM in Charlotte (Colleen Rogers) and terminating the 58–year old ASM in Columbia. Gower steadfastly refuses to consider that the fact that age of the ASM in the branch *into* which other branches were absorbed was under 40 *may* have been coincidental—he fails to recognize that Colleen Rogers *already was in Charlotte.* He has presented no evidence that would tend to suggest that, had the ASM's ages been reversed—i.e., that for example the Charlotte ASM had been 50 and the Raleigh or Columbia ASM's had been 30—the Charlotte incumbent would have been terminated and replaced by one of the younger ASM's whose branches had been absorbed.

In short, the plaintiff's evidence tends to show that personnel decisions made in order to effect the reorganization primarily were based on geography, not age. It is uncontested that not all offices underwent reorganization changes at the same time. And although Gower continues to draw the court's attention to his performance ratings, USF & G repeatedly has advised him during discovery that the personnel decisions of which he complains were not based on relative performance.[3] *See Zick v. Verson Allsteel Press Co.,* 644 F.Supp. at 913.

In responding to USF & G's motion for summary judgment, Gower simply has failed to satisfy the court that he will be able to prove at trial the fourth element of his prima facie case—that the employer failed to treat age neutrally in its personnel decisions related to the company's reorganization. Proof that he is over 40 and was not retained following a reduction-in-force but that some employees under 40 were retained, simply cannot carry the day. "[T]he burden is on the plaintiff to prove a set of circumstantial facts, which in the absence of a legitimate non-discriminatory explanation, leads one to conclude with reasonable probability that the action taken against him was the product of discrimination." *Cook v. CSX Transportation Corp.,* 988 F.2d 507, 512 (4th Cir.1993), citing *Duke v. Uniroyal,* 928 F.2d 1413, 1418 (4th Cir.1991). *See also Proud v. Stone,* 945 F.2d 796, 797 (4th Cir.1991) ("[a]ny ADEA plaintiff must make the elementary showings that he is a member of the protected group and that he has suffered unfavorable employment action taken by an employer covered by the Act. As the additional *key requirement,* a plaintiff must prove that age was 'a determining factor' in the employer's decision to take the adverse action") (citations omitted) (emphasis added).

USF & G points out that the statistics indicate that as of April 21, 1992, 13 of the ASM positions already had been eliminated and a few of the displaced ASM's were transferred to fill other positions within the company. On January 1, 1991, 32 of the 47 ASM's—68%—were *over* 40. By May 8, 1992, the date of Gower's termination, 24 of the then-remaining ASM's—70%—were *over* age 40. The last ASM position was abolished in July, 1993. By that date, there were 16 former ASM's who remained in USF & G's employee; 12—75%—were *over* age 40. Thus, from January 1991, through May 1993, as reorganization was being implemented, the percentage of ASM's in the company over age 40 steadily *increased.*

As Judge Robert D. Potter explained in *Richi v. Fruehauf Corp.,* 724 F.Supp. 1197, 1200 (W.D.N.C.), *aff'd mem.,* 888 F.2d 1386 (4th Cir.1989), "There is nothing in the law yet which would deny an employer the prerogative of discharging a person *if* he is over forty but only that the employer cannot discharge the employee *because* he is over forty." (Emphasis in original). "Although plaintiff may sincerely believe that he was fired because of his age, his belief does not constitute evidence." *Wilson v. Popp Yarn Corp.,* 680 F.Supp. 208, 214 (W.D.N.C.1988). Finally, "ADEA" is about age discrimination, not shabby or numbskull employment practices. Economically beset employers have

---

3. Gower even has conceded that Joe Kirk "was not comparing our performances in this. It had nothing to do with our performances and that he wasn't trying to tell me that I was a lesser employee." Gower Dep. at 86.

737

hard choices to make. But absent evidence of age discrimination—of which [plaintiff] has shown none here—"an employee cannot point the finger at another and say 'that one should have been fired, not I.'" *Zick v. Verson Allsteel Press Co.,* 644 F.Supp. at 913.

## CONCLUSION

For the foregoing reasons, and for those set forth in the defendant's briefs filed in support of their position, the court concludes that there exist no genuine issues of material fact for resolution by trial "as to whether age was a 'determining factor' in the employer's decision." *Duke v. Uniroyal, Inc.,* 928 F.2d 1413, 1417 (4th Cir.), *cert. denied,* 502 U.S. 963, 112 S.Ct. 429, 116 L.Ed.2d 449 (1991). Therefore, the plaintiff has failed to overcome the defendant's motion for summary judgment by making a showing that he will be able to prove each element of its case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Therefore, defendant's motion for summary judgment is ALLOWED on plaintiff's ADEA claim. The court, in its discretion, declines to retain the state law wrongful discharge claim which was appended to the ADEA claim by "pendent jurisdiction." Complaint para. 1. Plaintiff may pursue that claim in the appropriate division of the North Carolina General Courts of Justice.

SO ORDERED.